MARNWILH

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   UNITED STATES OF AMERICA,

4              v.                        15 Cr. 288 (RMB)

5   ENIKO WILSON,

6

7              Defendant.

8                                        Hearing on Violation
    ------------------------------x
9
                                         New York, N.Y.
10                                       October 27, 2022
                                         10:00 a.m.
11

12  Before:

13
                       HON. RICHARD M. BERMAN,
14
                                         District Judge
15
                       APPEARANCES (Via Telephone)
16
    DAMIAN WILLIAMS
17       United States Attorney for the
         Southern District of New York
18  BY:  HAGAN C. SCOTTEN
         Assistant United States Attorney
19
    HARVEY FISHBEIN
20       Attorney for Defendant

21  Also Present:
    Giavonnii Fodderingham, U.S. Probation
22

23

24

25

MARNWILH

1              THE COURT:  Good morning, everybody.

2              Good morning, Mr. Wilson and Mr. Fishbein and

3     probation and the U.S. Attorney's Office.

4              This is Judge Berman.

5              This is our first supervised release hearing in this

6     somewhat complicated, at least geographically, case.

7              We did get a memo from the probation department dated

8     October 12, 2022, and I'm going to make that Court Exhibit A to

9     today's proceeding.

10             It is a little bit complicated, but here's the way I

11    understand it.  This is supervised release before supervised

12    release came into play back in October of 2016.  Mr. Wilson was

13    sentenced to a 60-month term of imprisonment, followed by five

14    years of supervision.

15             Supervision, Mr. Wilson, is very different than the

16    term of incarceration.  Supervision is not intended, at least

17    in my experience, to be a punishment.  Supervision is the

18    period of time when the Court and probation and everybody else

19    that is on the phone endeavors to assist someone like yourself

20    to comply with the terms and conditions of supervision, which,,

21    as I said before, are typically not intended as punishment.

22             Following the five-year term of incarceration, as I

23    said, there was a five-year period of supervised release

24    imposed by me.

25             Here's where it gets a little bit complicated.

MARNWILH

1    Mr. Wilson was deported I think back to Jamaica, and then he

2    came back into the United States on or about I guess October

3    24, 2021, when he endeavored to reenter the United States and

4    he was arrested again.  I think he had a court case in

5    San Diego, in California in any event, and he was sentenced on

6    October 13, two thousand -- no, I'm sorry.  He was sentenced to

7    a one-year term of imprisonment, I think it was one year and a

8    day, followed by a year of supervision in southern California.

9           Following that sentence I understand he was

10   transferred to the custody of immigration authorities, and

11   sometime following that he was released from custody and has

12   wound up in New York, which is where he is now.

13          I think that's sort of a fair summary of what's

14   happened so far.

15          Probation has in the Exhibit A that I talked about

16   suggested that -- this is the part where it is a little bit

17   complicated as far as I'm concerned -- they are suggesting that

18   supervision gets transferred somehow back to California where

19   there is a one-year term of supervised release and the

20   five-year term of supervised release that I imposed be

21   terminated.

22          I am not exactly sure how one does that, but I think

23   that's sort of how I understand it anyway.  You probably all

24   understand it much better.

25          Let's do the following:

MARNWILH

```
 1          First of all, Mr. Fishbein, you are new to this case,
 2   but I take it you got yourself caught up to where we currently
 3   stand, among other things, by having spoken to Mr. Wilson
 4   before today's hearing; is that right?
 5          MR. FISHBEIN:  Yes, your Honor.  I was able to have a
 6   relatively brief conversation, but a conversation with him late
 7   yesterday, and I understand the facts as you just recited them
 8   as far as the sequence of events.  So we are up to --
 9          THE COURT:  Did you get -- I'm sorry.
10          MR. FISHBEIN:  That is okay.  Up to that point I
11   understand and I am in agreement.
12          THE COURT:  Did you get a chance to see probation's
13   October 12, 2022, submission to the Court?
14          MR. FISHBEIN:  Yes, I have.
15          THE COURT:  Okay.
16          MR. FISHBEIN:  I was furnished with the papers
17   yesterday.
18          THE COURT:  Good.
19          MR. FISHBEIN:  Or the day before.  The day before.
20          THE COURT:  That's great.  Why don't we turn for the
21   moment to the probation officer.  We can swear in the probation
22   officer, and I will try and figure out what are the next steps
23   and what can be done and what can't be done.
24          One thing I am interested in knowing, among other
25   things, is how did Mr. Wilson wind up in New York and where is
```

MARNWILH

1    he living, what is he doing, what are the terms of his

2    supervision and have those been implemented, etc., etc.  And

3    also what is likely to happen next so to speak in terms of

4    possible deportation again I assume.

5            But anyway, if we could, Christine, swear in the

6    probation officer and try and figure out where we are and where

7    we are going from here.

8            THE DEPUTY CLERK:  Yes, Judge.

9    GIOVANNI FODDERINGHAM, sworn.

10           THE COURT:  Okay.

11           So help us unravel where we are, Ms. Fodderingham, and

12   where we need to go.

13           MS. FODDERINGHAM:  Good morning, your Honor.

14           For your information, the information that we provided

15   in the court report is correct.  The only difference was, at

16   the end, Mr. Wilson's supervision was transferred to, the

17   Southern District of California term of supervision was

18   transferred to the Southern District, so we now are supervising

19   him under both jurisdictions so to speak.

20           THE COURT:  How did he get transferred to New York?

21           First of all, how physically did he get to New York,

22   and how did the supervision get transferred to New York?

23           MS. FODDERINGHAM:  So, once he was released from

24   imprisonment in California, he was transferred to ICE custody,

25   Immigration and Customs Enforcement, and he was released on an

MARNWILH

ankle monitor from immigration and he traveled to New York to

reside with his family.

THE COURT:  I see.

So he has family here in New York, does he?

MS. FODDERINGHAM:  Yes.

He resides in the Bronx with his family.

THE COURT:  In the Bronx?

MS. FODDERINGHAM:  Yeah.

THE COURT:  And that's where he's been living.  I got

it.

MS. FODDERINGHAM:  Yes.

THE COURT:  I don't have it in front of me, but you

may.  In the judgment, did we set forth terms and conditions of

supervision that we need to address or no?

MS. FODDERINGHAM:  Aside from the standard conditions,

the only special condition imposed by you was to be in

compliance with immigration.

THE COURT:  I got it.

And so if there were nothing else, if nothing else

happened in San Diego, for example, he would be here, which he

is, and he would be on supervision here, which he is, and how

would he be doing?  How would you say he would be doing here on

supervision so far?

MS. FODDERINGHAM:  I have only met him on two

occasions.  He was deported to Jamaica in September of 2020,

MARNWILH

1    and we were monitoring the case, which is how we were notified

2    of his reentry and his subsequent sentencing in the Southern

3    District of California.  So when an individual is deported, we

4    just monitor the case until the maximum expiration date is

5    reached.

6              THE COURT:  And is he in process of being deported

7    again?

8              MS. FODDERINGHAM:  I believe that will be the outcome.

9    I just am unsure.  I have not had any contact with anyone at

10   the immigration office.  I'm hoping to obtain at least an

11   officer that he's assigned to soon, but I don't have that

12   information yet.

13             So I believe that he reports regularly so that he

14   makes sure that he's in compliance, and I don't know what the

15   end result will be or how long it will take.

16             THE COURT:  I see.

17             In the meantime is he able to support himself here?

18   Is he able to work?  How does that work?  Is probation in a

19   position to be of help to him in any way?

20             MS. FODDERINGHAM:  Once I am able to contact the

21   immigration officer that will be assigned to him, we can see if

22   he will be able to be employed, how that will look.  And if he

23   is actually granted permission to work, then of course my

24   office can help him obtain employment and help him with any

25   other services that he needs.

MARNWILH

```
 1              THE COURT:  For the moment you are saying he's living
 2    with family members in the Bronx?
 3              MS. FODDERINGHAM:  Yes.
 4              THE COURT:  And have you done or will you do a home
 5    visit to see --
 6              MS. FODDERINGHAM:  Yes.  I plan to do a home
 7    inspection.
 8              THE COURT:  I got you.
 9              Okay.  So I might turn to the assistant for a minute
10    in this case to maybe help me understand the legalities of, you
11    know, deportation.
12              What's likely to happen to someone in Mr. Wilson's
13    case?  Can he stay here in the Bronx?  Can he work?  You know,
14    should we be helping him find a job?  Maybe he's found one
15    himself.  You know, that kind of thing.
16              MR. SCOTTEN:  Your Honor, I don't have any of the
17    specifics of the conditions of his parole.  I did check in with
18    Homeland Security, who, as you may recall, was one of the
19    investigating agencies on this case.  And that's somewhat
20    helpful because they have access to the customs and border
21    patrol records and so were able to tell me a little bit more.
22              But my understanding is essentially Mr. Wilson should
23    be detained.  He is not solely due to a bed space issue.  I did
24    not inquire about whether he had a work permit.  I suspect,
25    based on dealing with this in other cases where that actually
```

MARNWILH

takes some work to get a work permit, and is usually done only

when the person is here lawfully in some fashion such as maybe

being kept here to be a witness in another case.

         I strongly suspect he does not have permission to

work, but I don't know that.  My understanding is that he is

likely to be deported.

         But as I am sure your Honor saw, too, you know, the

report states that he is fighting deportation.  I have no idea

what his grounds are, so I can't opine on the likelihood of,

you know, if he has some grounds that would excuse him from

deportation.

         Given that he's already been removed once and

committed a second federal felony by illegally reentering, I

suspect he is not going to have a very strong case to fight

deportation, but I don't know that without seeing what his

claims are.

         I should however step back a bit.

         THE COURT:  Yes.

         MR. SCOTTEN:  I'm somewhat confused by the entire

nature of today's proceeding.

         THE COURT:  Me too.

         MR. SCOTTEN:  Mr. Wilson, one of his conditions of

release was not to commit any federal crimes.  He has

dispositively committed a federal crime.  He pled guilty to it,

he was convicted of it in a court, he served a year of jail

MARNWILH

1    time.

2           He is, without any doubt or room or discretion, in

3    violation of his conditions of supervised release.  He's also

4    probably commit a second violation, because as the probation

5    officer just told us, your Honor did require him to comply with

6    the requirements of the immigration authorities, foremost of

7    which was not to illegally reenter the country after being

8    deported.

9           So I simply cannot understand why the probation office

10   has not filed a violation and, frankly, why he is not detained,

11   because there is far more than clear and convincing evidence

12   that he has violated his conditions.  And I think the probation

13   officer's failure to do so is endangering the public.

14           THE COURT:  I don't know about -- well, if it's the

15   probation officer.  I was a little surprised that he was

16   released from ICE detention, because that's how I guess he got

17   to New York.

18           MR. SCOTTEN:  I agree with that, your Honor.

19           That also is unfortunate, and I checked in on that.

20   Apparently, it is a bed space issue, which sounds terrible, but

21   obviously there is not something I can do.  But he is sort

22   of -- he should be detained on two grounds.  He has clearly

23   violated his conditions of supervised release.  I don't know

24   why a specification hasn't been filed.

25           THE COURT:  Yes, I get it.

1          When you say bed space, they didn't have any room for

2    him?  Is that what you are saying?

3          MR. SCOTTEN:  Right.  This is obviously a decision

4    reached out in California, so I wasn't able to get the details.

5    It was just a question of our case agent checking, you know,

6    what he could get from a raw database.

7          But it sounds like they are just so overloaded with

8    people entering the country unlawfully that even convicted

9    felons like Mr. Wilson are in some cases being paroled with an

10   ankle monitor because they just don't have the space to detain

11   him.

12         THE COURT:  Are they, when you say -- I assume we are

13   talking about the immigration authorities.  Are they in some

14   fashion supervising him here in New York or no?

15         MR. SCOTTEN:  Not to my knowledge.  I don't think

16   there is much of a supervision regime for this other than, you

17   know, he's got an ankle monitor, although since he's traveled

18   all the way from California to New York I am not exactly sure,

19   you know, where he could get in trouble for going if he's

20   allowed to cross the entire country with it.

21         I can try to find out for the Court what supervision

22   he's receiving from the immigration authorities.  But to be

23   clear, I may be of the position that there is a judicial

24   responsibility here which is entirely separate.  There is no

25   reason he shouldn't be facing a specification, which would

1    render immigration supervision obsolete.

2              THE COURT:  Oh, yeah.  I guess that -- I am kind of

3    interested in the interplay between supervised release and ICE

4    immigration detention.  For example, who monitors the bracelet,

5    if anybody?  You know what I mean?

6              MR. SCOTTEN:  Yes, your Honor.  I can try to find out,

7    assuming it's ICE and not the probation office who is

8    monitoring that.

9              I can certainly check HSI channels to see if they know

10   who's monitoring it, although, again, if he were detained for

11   having violated his conditions of supervised release by

12   committing another felony, the bracelet issue would certainly

13   go away.

14             THE COURT:  Yeah.  I think in Exhibit A, which is the

15   probation report, I think they're suggesting that he be

16   returned to California and that supervision in New York be

17   terminated.

18             I don't really know how that happens or would happen.

19   I am not doing it right now, because I think that requires a

20   little more investigation as to, you know, where he would go

21   and that kind of thing.

22             So for the moment then, he's here.  He's in the Bronx.

23   And I know that probation is going to do a home visit just to

24   see, you know, where he's staying, and we do want to know if

25   he's permitted to work, or if he is working or if he is on

MARNWILH

1  supervision what conditions, if any, are applicable.

2          So it is a little bit of an unusual case and I think

3  we need to do a little more investigation is what I am saying.

4          Now, Mr. Fishbein, what were you able to understand to

5  be the status where things stand at the moment vis-a-vis

6  Mr. Wilson?

7          MR. FISHBEIN:  Actually, Judge, I don't have any

8  information beyond what has been discussed already.

9          THE COURT:  Okay.  I mean, you know what we know.

10          MR. FISHBEIN:  That's correct.

11          THE COURT:  Okay.  Yeah.  I would say that for

12  openers, we really should do the home inspection as quickly as

13  we can.

14          Probation, do you know in any more detail how

15  Mr. Wilson is, you know, how is he supporting himself or

16  whether he's permitted to work, whether there needs to be, as

17  Mr. Scotten is saying, a violation filed?

18          It is a very unusual case.  We do want to make sure

19  that Mr. Wilson is receiving the attention he ought to receive.

20  Do you know what I mean?

21          MS. FODDERINGHAM:  Yes, your Honor.  I understand the

22  Court and the government's concern regarding the violation.  I

23  do apologize, but I was following the directives of my

24  higher-up.  And this is the way that I was told to take.

25          THE COURT:  Yes.

MARNWILH

1          MS. FODDERINGHAM:  So, to be clear, I was requesting

2     that the Southern District supervised release be early

3     terminated, and we would continue to supervise Mr. Wilson under

4     the one-year term of supervision given by the Southern District

5     of California.  Once he leaves --

6          THE COURT:  Yes.  That's the --

7          MS. FODDERINGHAM:  Sorry?

8          THE COURT:  I was going to say that five-year/one-year

9     thing, I don't know that you can just ordinarily either legally

10    or appropriately terminate the five-year term.  Usually early

11    termination is reserved for people who are doing exceptionally

12    well on supervision.

13         MS. FODDERINGHAM:  Yes, I understand that.

14         THE COURT:  Yes.  So I don't think that is our case

15    here exactly.  So I think we should keep for the moment the

16    supervision under the judgment while here to do some

17    investigation, you know, home visit, all that, and I think the

18    big burden will fall on Mr. Scotten to help us understand the

19    legalities of two different terms of supervision and, more

20    importantly, two geographies, one New York and one California

21    and realistically -- not only realistically, but what is the

22    most helpful way to go about it.

23         But for the moment, since he's here and since we have

24    supervision over him as a result of the judgment, I think for

25    the immediate future I am going to assume that we are

1  supervising him and we have to figure out what he's able to do

2  during that period of supervision lawfully.

3          MS. FODDERINGHAM:  You are correct, your Honor.  We

4  are supervising him and California has transferred their

5  supervision to the Southern District of New York, so we are

6  totally responsible for him.

7          THE COURT:  They actually sent a transfer set of

8  papers or whatever?

9          MS. FODDERINGHAM:  Yes.  They sent an official request

10  for transfer of supervision to the Southern District of New

11  York based on his residence currently, which is in the Bronx.

12          THE COURT:  And SDNY New York has accepted that

13  transfer?

14          MS. FODDERINGHAM:  Yes, we have.

15          THE COURT:  Oh.  All right.  Yeah.  So that's

16  consistent with what I was suggesting, which is that he's here,

17  we've got him, and now we hear that we officially -- that is to

18  say the probation department --

19          MS. FODDERINGHAM:  Yes.

20          THE COURT:  This is the first I have heard about this

21  case, but they have accepted supervision.

22          So, Mr. Scotten, that is some help.

23          It may render moot the suggestion that we send him

24  back for one year of supervision if he's already been

25  transferred here for five years of supervision, but that is

MARNWILH

something I think I am going to depend on you to help sort out,
you know, what the legal status is for him.

MR. SCOTTEN:  To be clear, your Honor, I don't think
there is a lack of clarity on that point now.  There was before
today's conference, because the paperwork wasn't entirely up to
date.

But, based on the probation officer's explanation,
he's here.  He never left here for supervision because there
was never a transfer of supervision to California from this
court's sentence, so that five-year term has always been here.

As your Honor alluded to just a minute ago, if the
California term has also been transferred here, then I don't
think there's really any ambiguity or further research.  He is
being supervised by this court.  I am happy to --

THE COURT:  Yeah.

MR. SCOTTEN:  -- to find out what conditions, if any,
he is subject to on the ICE side, which is, you know, sort of
not within this Court's supervision, to see if there's any
overlap or lack of overlap, etc.  So I will look into that.

THE COURT:  Yeah.

MR. SCOTTEN:  But I do have to repeat -- and, frankly,
I have never looked into it before, sort of this office's
authority to proceed alone if the probation officer doesn't
file a specification, but I really would ask the Court to
inquire why a specification has not been filed.  There is

MARNWILH

1    literally no doubt that he violated his conditions of

2    supervised release.  I have never seen it where someone has

3    pled guilty to committing a federal felony while on supervised

4    release and a specification has not been filed.  I would really

5    ask the Court to put that directly to the probation officer.

6               THE COURT:  Yes.

7               Well, I think she's taken that to heart and will

8    probably want to discuss that with her supervisor.  My guess

9    would be that there would probably be a violation filed here in

10   supervision, right?  Would that be the next step that you would

11   be taking?

12              MS. FODDERINGHAM:  Again, your Honor, I was following

13   the orders of my chain of command --

14              THE COURT:  I know.

15              MS. FODDERINGHAM:  -- when I submitted that report.

16   If the Court is requesting a violation be filed then absolutely

17   I will file one.

18              THE COURT:  Well, you know, it is not the Court's

19   prerogative.  I would like you to have a fuller discussion with

20   your department, because, you know, you have this application

21   that we terminate our supervision, so that doesn't make much

22   sense, and we send him back to California.  That doesn't make

23   much sense.

24              So I think that in response to your application to the

25   Court, your application for judicial response, I think what I

MARNWILH

1    am going to do is check off "Other," and I am going to also ask

2    that probation do a thorough review of this case and determine

3    what next steps our SDNY probation department intends to take

4            That could include withdrawing the request to

5    terminate supervision in New York, and that could also include

6    pursuing the five-year term of supervision in New York.

7            As Mr. Scotten has pointed out, isn't there a basis

8    for SDNY probation to file a specification in light of the fact

9    that he not only pled but was in jail for a year in California,

10   which would appear to be a violation of the terms and

11   conditions of supervision?

12           So I think you need to have a thorough conversation

13   with your associates and supervisor and determine, instead of

14   the application that's currently pending what application and

15   what probation SDNY proposes to do now that we have had today's

16   conversation and we better understand the facts what's next in

17   terms of supervision.

18           Is that fair?

19           MS. FODDERINGHAM:  Yes, that's fair.

20           THE COURT:  Okay.  So I don't think we should take too

21   long for that.  Maybe we can ask Mr. Wilson if he's settled in

22   the Bronx, if he has a place to live first of all.

23           Mr. Wilson?

24           THE DEFENDANT:  Yes, your Honor.

25           THE COURT:  Do I understand correctly that you are

MARNWILH

here in New York, you are in the Bronx, and living with family members?

THE DEFENDANT:  Yes, your Honor.

THE COURT:  And is that okay?

Is that working out with you and with the other family members?

THE DEFENDANT:  Yes, your Honor.

THE COURT:  Okay.  So you have a place to stay while you are here in New York.

Is that right?

THE DEFENDANT:  Yes, your Honor.

THE COURT:  I don't know if this has come up, but how are you supporting yourself?

Are you working here in New York or what?

THE DEFENDANT:  No, I'm not working, your Honor.

THE COURT:  Okay.  Who are you living with?  A sister? Parents?

THE DEFENDANT:  Yeah, my mom.

THE COURT:  Okay.

Typically what would happen, and probation has said that they will, they will come out and visit your mom's place just to see what the living situation is.

THE DEFENDANT:  Yes.

THE COURT:  Okay.  Okey-dokey.

How did you get, by the way, from California to New

MARNWILH

1   York?  Did you fly here?  Did you come by bus?

2            THE DEFENDANT:  Yeah.

3            THE COURT:  You flew?

4            THE DEFENDANT:  I flew.

5            THE COURT:  Okay.  Does anybody from California check

6   in with you or call you or ask you to call them?

7            Are they supervising you in any way that you are aware

8   of?

9            THE DEFENDANT:  No, your Honor.

10           THE COURT:  I get it.  All right.

11           I think I have it.  I understand it.

12           All right.  So, Mr. Fishbein, I think you can do a

13  little research, everybody is, and we are going to get together

14  again pretty soon and figure out what's up here and where we

15  are going, unless you have thoughts about that now, I'm happy

16  to hear it.

17           MR. FISHBEIN:  I don't have anything to add at this

18  point, Judge.

19           THE COURT:  Okay.

20           Let's ask probation.  Probation, how long do you think

21  it would take for you to do your internal review and perhaps do

22  a home visit and confer with Mr. Wilson, who is now being

23  supervised in New York pursuant to a judgment which has him on

24  five years of supervision?

25           How long do you think you need before you can get back

MARNWILH

1  | to us?

2  |          MS. FODDERINGHAM:  Your Honor, I will be away at

3  | training in South Carolina for one week.  So I would ask that I

4  | can be given at least two weeks.  When I return, I will do the

5  | home inspection.  And while I am away, when I have free time, I

6  | will try to find out as much information about his immigration

7  | supervision as I can.

8  |          THE COURT:  Okay.  So would you say that three or four

9  | weeks from now would be okay?

10 |          MS. FODDERINGHAM:  Yes.

11 |          THE COURT:  By the way, I think, as Mr. Scotten has

12 | pointed out -- and you may want to talk to him after we finish

13 | this hearing today as to specifications -- you have heard what

14 | his thought is -- and see what your department feels about

15 | that.  Okay?

16 |          MS. FODDERINGHAM:  Okay.  Yes.

17 |          THE COURT:  So, Christine, what do you think about

18 | three or four weeks?

19 |          THE DEPUTY CLERK:  Judge, how is November 28 at 11:30?

20 |          THE COURT:  So, probation, is that good for you?

21 |          MS. FODDERINGHAM:  Yes.  That works for me.

22 |          THE COURT:  And Hagan, is that good tore you?

23 |          MR. SCOTTEN:  Your Honor, I can certainly make that

24 | date.  I would request a sooner date.  I think I do have to

25 | note, since it is -- it falls on me partly to protect, the

MARNWILH

1   public, I do think ultimately it is your Honor's prerogative.

2   You had said a minute ago that it wasn't.  But the probation

3   office works for your Honor, so I think it ultimately your

4   Honor's prerogative whether there is a specification here or

5   not.

6        And I think the Court has, you know, sent the

7   probation officer to talk about it, but I would just note

8   ultimately this does -- it is up to you.  If they don't want to

9   file a specification, you absolutely can and should tell them

10  to do so.

11       THE COURT:  Yeah.

12       MR. SCOTTEN:  The government remains concerned that a

13  twice-convicted felon will be at liberty for a month for no

14  apparent reason.

15       THE COURT:  Yeah.

16       So I think that, you know, when the officer goes back,

17  in fact today, tomorrow, she's going to have a different take

18  on how things should proceed, and she's probably going to want

19  to withdraw the submission that she's made, Court Exhibit A,

20  and replace that with something different that suits the facts

21  of this case.

22       I get it.  I think I understand my authority.  I think

23  I would prefer if probation gave it a more thorough analysis.

24  They may very well come up with that solution themselves, and I

25  think that would be appropriate.

1              So November 28 is our date.

2              Probation, you know, I agree with Mr. Scotten.  I

3      think that is a more appropriate direction to go in, namely,

4      the filing of a probation specification and the withdrawal of

5      the application that's currently before the Court.  I think you

6      should take a look at that as soon as you can and -- as soon as

7      possible actually, so we get this straightened out.

8              MS. FODDERINGHAM:  Okay.  I will.

9              THE COURT:  Okay.  Mr. Wilson, you got it that

10     November 28 we are having another hearing?

11             THE DEFENDANT:  Yes, your Honor.

12             THE COURT:  And, Mr. Fishbein, you are okay for that

13     as well?

14             MR. FISHBEIN:  That's correct, your Honor.

15             THE COURT:  Okay.

16             So it is also true, right, Mr. Scotten, that for that

17     violation, Mr. Wilson has served an additional year

18     incarceration and received an additional term of one year of

19     supervision as a result of reentering the country?

20             You realize that, Mr. Scotten, right?

21             MR. SCOTTEN:  I am aware that he has served his

22     sentence on the underlying felony.  But as your Honor knows,

23     under the guidelines and Second Circuit precedent, that is not

24     in any way punishment for the violation of supervised release,

25     which is a separate violation of the Court's trust.

MARNWILH

```
 1              THE COURT:  I totally get it.  But it is not as if he
 2    hasn't faced any consequences as a result of coming back to the
 3    United States.  Indeed, he's gotten a one-year sentence, which
 4    he has completed in fact.
 5              So I get it.  I think I know my responsibility, and I
 6    think we all, everybody on this call knows their
 7    responsibility.
 8              We will talk again on November 28.
 9              OK.  Thanks, everybody.
10              MR. SCOTTEN:  Thank you, your Honor.
11              THE COURT: You bet.  Bye-bye.
12              THE DEFENDANT:  Thank you, your Honor.
13              MS. FODDERINGHAM:  Thank you.
14              THE COURT:  Yes.  Thanks everybody.
15              (Adjourned)
16
17
18
19
20
21
22
23
24
25
```